IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HEALTHBOX GLOBAL PARTNERS, )
LLC, )
                            )
       Plaintiff, )
                            )
     v. )          Civ. No. 16-146-SLR
                            )
UNDER ARMOUR, INC., )
                            )
       Defendant. )

## MEMORANDUM

At Wilmington this 19th day of July, 2016, having reviewed the papers filed in connection with plaintiff's motion for preliminary injunction, and having heard oral argument on the same, the court issues its decision to deny the motion, for the following reasons:

1. **Procedural background.** On March 8, 2016, plaintiff Healthbox Global Partners, LLC ("plaintiff") filed a complaint alleging trademark infringement, unfair competition pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and state law claims for dilution and deceptive trade practices against defendant Under Armour Inc. ("defendant"). (D.I. 1) On April 28, 2016, defendant answered the complaint. (D.I. 20) The court has jurisdiction over the copyright and Lanham Act claims pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), and 15 U.S.C. § 1121(a). The court has supplemental jurisdiction over plaintiff's additional claims pursuant to 28 U.S.C. § 1367(a).

2.  Plaintiff is a Delaware limited liability company with a principal place of business in Chicago, Illinois.  (D.I. 1 at ¶ 1)  Since 2011, plaintiff[1] has been "providing consulting and incubation services in the healthcare industry, including wellness and fitness."  (D.I. 14 at ¶ 3)  Defendant is a corporation formed under the laws of the State of Maryland with a principal place of business in Baltimore, Maryland.  (D.I. 20 at ¶ 2)  Defendant, which launched in 1996, is a sports product company targeting athletes and fitness-minded consumers.  It offers a variety of athletic merchandise including a box of connected fitness devices.  (D.I. 24 at 1-2)

3.  **Factual background.**  Since about 2012, plaintiff has spent over a million dollars developing and promoting its brand, including attending speaking engagements at healthcare and leadership conferences in the United States and elsewhere, and issuing periodic press releases. (D.I. 14 at ¶¶ 6-8, ex. 5)  Plaintiff owns United States Trademark Registration No. 4,305,142 for the mark Healthbox®, registered on March 19, 2013, with a first use date of September 1, 2011.  (*Id.* at ¶ 3, exs. 1-4)  The Healthbox® mark was registered for use in connection with advisory and incubation services and funding for start-ups and existing businesses in the healthcare industry (Classes 35 and 36).  (*Id.* at ¶¶ 4-5)  In connection with its services and the products of its portfolio companies, plaintiff uses the logo,  ⬚ Healthbox™  .  (*Id.* at ¶ 6)  Plaintiff has a "Healthbox® Studio Program" (formerly Accelerator), wherein it selects innovative, early-stage healthcare companies (sometimes taking an equity interest) and provides an intensive four-month program to enhance the companies' ability to succeed in the healthcare marketplace.  (*Id.* at ¶¶ 11-12)  In the last four years, of the 2,000

---

[1] And its predecessors.

2

companies which have applied to the Healthbox® Studio Program, plaintiff has made an equity investment in and partnered with 86 companies. The Healthbox® mark and logo have appeared in press releases, joint marketing, and directly on the websites of a number of companies with products specifically targeting consumers interested in health, wellness, and fitness. These companies include Fitness Cubed (which sells an elliptical machine), PUSH for Wellness, Peerfit, Platejoy, Soma Analytics, Salaso, and Sensing Strip. (*Id.* at ¶¶ 14-15, ex. 8)

4. Since 1996, defendant has used the corporate logo, ⱡⱡ , and its "UA" trademark/name abbreviation. Defendant also pairs its marks with other terms to create product names for its various goods – UA ColdGear, ⱡⱡSPINE , UA SPEEDFORM, and ⱡⱡCOOLSWITCH . Both the ⱡⱡ logo and the UA marks have become widely recognized and associated with defendant. (D.I. 25 at ¶¶ 2-3) Defendant's focus is "making athletes perform better." (*Id.* at ¶ 4) In 2011, defendant began offering electronic fitness devices targeted to its existing customer base. (*Id.* at ¶ 4) In December 2014, defendant selected the ⱡⱡ /UA HEALTHBOX marks for a suite of devices physically packaged together in a box. According to defendant, the term "healthbox" was chosen to convey the nature of the product, which is packed in a box and used to get fit or healthy. The term is combined with defendant's known marks or with the name "UNDER ARMOUR." (*Id.* at ¶¶ 5-12) On January 7, 2015, defendant filed a federal trademark application for UA RECORD HEALTHBOX (App. No. 86/496,990) and on July 17, 2015, for the marks UA HEALTHBOX (App. No. 86/696,524) and ⱡⱡHEALTHBOX (App. No. 86/696,556). The marks were designated for use with multifunctional and wearable electronic devices for receiving,

3

displaying, processing, and uploading health and fitness data to the Internet (Class 9).
(D.I. 15, exs. 18-20) In February 2015, defendant announced the creation of the world's
largest digital health and fitness community and full year net revenues of $3.08 billion.
Defendant stated that it was focused on creating the largest Connected Fitness
platform, through its recent launch of the UA RECORD application ("app").[2] (*Id.*, ex. 21)
In March 2015, defendant announced the opening of a digital headquarters in Austin,
Texas, employing "more than 100 industry-leading engineers, data scientists, designers,
and product innovators in digital health, fitness, and sports . . . . The Under Armour
Connected Fitness™ platform powers the world's largest digital health and fitness
community through a suite of apps: UA Record, MapMyFitness, Endomondo and
MyFitnessPal."[3] (*Id.*, ex. 22)

5. In June 2015, Rudy Magna ("Magna"), defendant's director of business
development, sent an e-mail to plaintiff's general e-mail account soliciting information
about "align[ing] strategic partners with" plaintiff. (D.I. 13 at ¶ 2, ex. 12) According to
defendant, it routinely meets and reaches out to companies. In the average month,
defendant alleges its Connected Fitness team sends and receives more than 120
communications to third parties similar to the one sent to plaintiff. Defendant contends
Magna's contact was to determine whether any of plaintiff's portfolio companies (but not
plaintiff itself) would be suitable candidates to link to the UA RECORD app. Magna

---

[2] *Under Armour Reports Full Year Net Revenues Growth Of 32%; Announces Creation Of World's Largest Digital Health And Fitness Community* (February 4, 2015),
http://investor.underarmour.com/releasedetail.cfm?releaseid=894686.
[3] *Under Armour Opens First Digital Headquarters in Austin's Revitalized Seaholm Power Plant District* (March 11, 2015), http://investor.underarmour.com/release
detail.cfm?releaseid=901074.

4

alleges he had no involvement with the selection of the marks and the requested contact had nothing to do with the UA HEALTHBOX product or marks. (D.I. 26) From June to November 2015, the parties corresponded via email and telephone, discussing several of plaintiff's portfolio companies that developed connected fitness applications and devices, including Fitness Cubed, Sensing Strip, Soma Analytics, Salaso, PUSH Wellness, Peerfit, and PlateJoy. (D.I. 13; D.I. 26 at ¶¶ 10-11) Defendant alleges it ultimately spoke with FitnessCubed regarding possible interoperability of its product with the UA RECORD app, but the interoperation did not happen. (D.I. 26 at ¶ 11)

6. In January 2016, defendant launched the ⚡⚡ /UA HEALTHBOX product as a "Connected Fitness system made by athletes for athletes."[4] (D.I. 15, ex. 23) The product comes in a "box" containing a complete connected fitness system comprised of the "UA Band," the "UA Scale," and the "UA Heart Rate." Data output from these devices (and others) is collected and tracked on the UA RECORD mobile app, which is not part of the ⚡⚡ /UA HEALTHBOX product nor branded as such. The product retails for $400 and is available through defendant, HTC, and national retailers of athletic and electronic goods, including Best Buy, Dick's Sporting Goods, and Target. The "UA Band" may be purchased as a standalone product for $180. (D.I. 25 at ¶¶ 5-11, 18)

7. Plaintiff alleges that, prior to defendant's launch of the ⚡⚡ /UA HEALTHBOX product, a Google search for "healthbox" returned results wherein the top two links and five out of the first ten links pointed to plaintiff. After the launch, the same

---

[4] *Under Armour Launches A Suite Of Connected Fitness Products, Changing The Way Athletes Live* (January 5, 2016), http://investor.underarmour.com/release detail.cfm?releaseid=948792.

5

Google search returned results wherein nine of the first ten links pointed to defendant's UA HEALTHBOX product. A Google search for "healthbox review" returns results wherein all of the top ten links are to defendant's product. (D.I. 15 at ¶ 19, exs. 28-29) Plaintiff further alleges that from the time of defendant's launch, first time visitors to its website spiked to an all-time high and continued into February 2016 at a materially higher rate than typical. (D.I. 14 at ¶ 21) Plaintiff alleges that the term "healthbox" "in connection with healthcare technology has come to exclusively identify Healthbox®," plaintiff's trademark. (Id. at ¶ 24) Plaintiff alleges it received emails from third parties expressing confusion after defendant's launch. Nina Nashif ("Nashif"), plaintiff's founder and CEO, provides two emails and Ateet Adhikari ("Adhikari"), plaintiff's vice president of operations, provides three emails. (Id. at ¶¶ 22-23, exs. 10-11; D.I. 12 at ¶¶ 6-7, exs. 15-17)

8. According to defendant, searches for "healthbox services," "healthbox consulting," "healthbox incubator," "healthbox studio," and "healthbox accelerator," each return eight or more links out of ten pointing to plaintiff. (D.I. 28 at ¶ 11, ex. 9) Defendant also provides search results identifying multiple other users of the terms "healthbox" or "health box."[5] (D.I. 28 at ¶ 12, ex. 11) Defendant's declarant asserts that he was not aware of any instance of confusion between the parties or the respective products and services. (D.I. 25 at ¶ 14)

_____

[5] Such as www.themenshealthbox.com (MEN'S HEALTH BOX fitness products by worldwide publishing giant Rodale); www.healthboxclinic.com (HEALTH BOX health clinic only 20 miles away from Healthbox LLC's headquarters); www.besthealthbox.com (BEST HEALTH BOX online health store and information source); www.activehealthbox.com.au (ACTIVE HEALTH BOX health products); and www.myhealthbox.eu (MY HEALTH BOX health app and information).

9. **Standard.** As explained by the United States Court of Appeals for the Third

Circuit,

> [p]reliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." . . . "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." . . . The "failure to establish any element . . . renders a preliminary injunction inappropriate." . . . The movant bears the burden of showing that these four factors weigh in favor of granting the injunction.

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citations

omitted). "'[O]ne of the goals of the preliminary injunction analysis is to maintain the

status quo, defined as the last, peaceable, noncontested status of the parties.'" *Kos*

*Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). "[T]he

decision whether to grant or deny injunctive relief rests within the equitable discretion of

the district courts, and . . . such discretion must be exercised consistent with traditional

principles of equity . . . ." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

10. **Likelihood of success on the merits – trademark infringement and**

**unfair competition.** The Third Circuit "measure[s] federal trademark infringement, 15

U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical

standards." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210

(3d Cir. 2000). The Lanham Act defines trademark infringement as use of a mark so

similar to that of a prior user as to be "likely to cause confusion, or to cause mistake, or

to deceive." 15 U.S.C. § 1114(1). To prove trademark infringement, plaintiff must show

that: (1) the mark is valid and legally protectable; (2) plaintiff owns the mark; and (3)

defendant's use of the mark to identify goods or services is likely to create confusion

7

concerning the origin of the goods or services. *Fisons Horticulture, Inc. v. Vigoro*

*Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994) (citations omitted).

> The traditional pattern of classic "forward confusion" occurs when
> customers mistakenly think that the junior user's goods or services are
> from the same source as or are connected with the senior user's goods or
> services. Customers want to buy the senior user's product and because
> of the similarity of marks, mistakenly buy the junior user's product instead.
> In "reverse confusion," customers purchase the senior user's goods under
> the mistaken impression that they are getting the goods of the junior user.
> That is, reverse confusion occurs when the junior user's advertising and
> promotion so swamps the senior user's reputation in the market that
> customers are likely to be confused into thinking that the senior user's
> goods are those of the junior user: the reverse of traditional confusion.

4 *McCarthy on Trademarks and Unfair Competition* § 23:10 (4th ed.). Generally, "a

larger, more powerful company uses the trademark of a smaller, less powerful senior

owner and thereby causes likely confusion as to the source of the senior user's goods

or services. Thus, the junior user is junior in time but senior in market dominance or

size." "[T]he doctrine of reverse confusion is designed to prevent ... a larger, more

powerful company usurping the business identity of a smaller senior user."

*Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 471-72 (3d Cir. 2005)

(citations and internal quotation marks omitted); *A & H Sportswear*, 237 F.3d at 228-29

(citations omitted). The result of reverse confusion "is that the senior user loses the

value of the trademark—its product identity, corporate identity, control over its goodwill

and reputation, and ability to move into new markets." *Freedom Card*, 432 F.3d at 471.

11. The Third Circuit has identified a number of factors to aid in determining

likelihood of confusion. In the reverse confusion context, those factors include:

> (1) the degree of similarity between the owner's mark and the alleged
> infringing mark;

(2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

*A & H Sportswear*, 237 F.3d at 234 (tracking the factors developed in *Interpace Corp. v.*

*Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983) ("the *Lapp* factors")). As with the test for

direct confusion, no one factor is dispositive," and certain factors may not apply in all

cases. "The weight given to each factor in the overall picture, as well as its weighing for

plaintiff or defendant, must be done on an individual fact-specific basis." *Id.* (citing

*Fisons*, 30 F.3d at 476 n.11).

12. The parties do not dispute the validity and ownership of the trademarks at

issue. (D.I. 11; D.I. 24 at 4-5) "Where the goods or services are not competing, the

similarity of the marks is only one of a number of factors the court must examine to

determine likelihood of confusion." With "non-competing goods or services, the court

must look beyond the trademark to the nature of the products themselves, and to the

context in which they are marketed and sold. The closer the relationship between the

9

products, and the more similar their sales contexts, the greater the likelihood of confusion." *Fisons*, 30 F.3d at 473.  At bar, plaintiff and defendant do not directly compete.  Plaintiff offers advisory and incubation services for start-ups (and funding for certain portfolio companies) and existing businesses in the healthcare industry.  Defendant offers apparel and other fitness products for sale to customers, and specifically targets athletes and fitness-minded consumers.[6]  With this backdrop in mind, the court evaluates each *Lapp* factor in the order presented above.

13.  **Degree of similarity (*Lapp* #1).**  To determine the similarity of the marks, "the court looks to sight, sound, and meaning, and compares whether these elements combine to create a general commercial impression that is the same for the two marks." *A & H Sportswear*, 237 F.3d at 229 (citation omitted).  The marks at bar – Healthbox® and   /UA HEALTHBOX – each use the term "healthbox."  Defendant uses the term exclusively in capital letters and in a different font.  Moreover, defendant always ties the term with its house mark, either    or UA.  The sound of the mark is

_____

[6] The court declines to address at length plaintiff's arguments that the goods sold by its portfolio companies should factor into the analysis of the *Lapp* factors, which arguments plaintiff largely abandons in its reply brief.  Plaintiff's consulting services are aimed at the healthcare industry and defendant's product is health-oriented.  This tenuous connection, however, does not allow plaintiff to merge its consulting services with products sold by its portfolio companies to argue that plaintiff in some way provides competing products.  *See, e.g., Bridges in Orgs., Inc. v. Bureau of Nat'l Affairs, Inc.*, 19 U.S.P.Q.2d 1827, 1834 (D. Md. 1991), *aff'd*, 983 F.2d 1055 (4th Cir. 1993) ("[A]lthough plaintiffs' services and defendants' videos may deal with the same subject matter, the Court finds that from the perspective of a purchaser surveying the markets, consultants and videos are not similar."); *see also, Checkpoint*, 269 F.3d at 288 ("When two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark.") (citations omitted).  For the same reasons, the use of the Healthbox® mark and logo used directly on the websites of a small number of plaintiff's portfolio companies is not properly the focus of the analysis.

10

virtually identical, with the exception of the pairing with "UA."  The meaning of the marks

offers some dissimilarity, with defendant's mark describing "health" in a "box."

14.  In context, defendant uses its mark on an actual product.  This is distinct

from plaintiff's use of its mark on its website offering an "advanced platform for

innovation" through two programs designed to target either serious start-ups in

healthcare or large healthcare organizations.  (D.I. 24, ex. A)  As to the use of the house

mark, the Third Circuit has explained that a district court should consider the possibility

that the house mark "will aggravate, rather than mitigate, reverse confusion, by

reinforcing the association of [a term] exclusively with" the junior user.  *A & H*

*Sportswear*, 237 F.3d at 230.  In the case at bar, defendant's house mark is always

used with the term "healthbox" and is displayed (in capital letters and a different font) on

an actual product.  An individual looking at plaintiff's mark in connection with its website[7]

would not associate plaintiff or its offerings of advice and investment with the physical

/UA HEALTHBOX product.  As the companies are not competitors and there is

only one physical product at bar, the court concludes that the use of the house mark

mitigates against confusion.  This factor weighs in favor of defendant.

15.  **Strength of mark (*Lapp* #2).**  Courts should "examine:  (1) the mark's

distinctiveness or conceptual strength (the inherent features of the mark) and (2) its

commercial strength (factual evidence of marketplace recognition)."  *Freedom Card*,

432 F.3d at 472 (citation omitted).  The conceptual strength of a mark is measured by

classifying the mark in one of four categories ranging from the strongest to the weakest:

arbitrary or fanciful; suggestive; descriptive; or generic.  Stronger marks receive greater

---

[7] Or even at the bottom of a portfolio company's webpage.

protection. *Id.* (citation omitted).   Plaintiff argues that its mark is suggestive and, therefore, stronger than defendant's descriptive mark.  Accepting plaintiff's classification of its mark as suggestive does not end the inquiry.  While the classification of a mark as arbitrary, suggestive, or descriptive may guide the determination of the degree of protection a mark should receive, "[s]uggestive or arbitrary marks may, in fact, be 'weak' marks, particularly if they are used in connection with a number of different products." *A & H Sportswear*, 237 F.3d at 222.  Defendant presents evidence that the term "healthbox" is used in conjunction with a number of products and services with associated trademarks and logos.  (D.I. 28 at ¶ 12, ex. 11)  Plaintiff argues that such evidence is irrelevant, without assessing "the impact of [the] existence [of similar names] on the consuming public." *Accu Pers., Inc. v. AccuStaff, Inc.*, 823 F. Supp. 1161 (D. Del. 1993).[8]  Defendant's evidence is the product of an Internet search with sources such as publishing company Rodele and a health clinic located 30 miles from plaintiff's offices.  Moreover, such search results yield links to websites, which may be visited to show that they are currently in use.  In the age of online shopping and searching,[9] such evidence is persuasive in demonstrating that other uses of the term "healthbox" exist in a number of markets. *See, e.g., Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 466 (E.D. Pa. 2012) (stating that "Microsoft has presented ample

---

[8] Wherein the court assessed the impact of third party uses on the strength of a mark, stating that "[o]f the eighteen marks submitted by defendant, the record contains evidence of actual use of the marks by seven firms," with one located in the same geographic region as plaintiff.  The court explained that "there [wa]s little evidence that the consuming public has had to learn to make fine distinctions between similar names due to the abundance of such names used by similar service providers in their market." The court concluded that the "assertion that plaintiff's mark has been weakened by a crowded field is unpersuasive." *Accu Pers.*, 823 F. Supp at 1166-67.

[9] For example, plaintiff's reliance on google searches.

undisputed evidence demonstrating the widespread use of the term "kin" in the marks of a litany of products and services that occupy the 'social networking for families and friends' market.").

16. As to commercial strength, defendant properly contends that while it is commercially strong in its own market, it is commercially weak in plaintiff's market. Defendant's strength within the sport's article market has little or no impact on consumers within plaintiff's market, i.e., company executives looking for advice or financing. Moreover, the decision-makers looking for such advice or financing would not be the target audience for defendant's advertising or marketing (at least not in their professional roles). The Google searches cited by both parties support this conclusion. A search for "healthbox" delivers top results for defendant's products as "healthbox" is both name and descriptor. However, a search for "healthbox services"[10] (descriptive of plaintiff's services) returns eight or more links out of ten referencing plaintiff. *See Checkpoint Sys.*, 269 F.3d at 303-04 (finding that a focused analysis of the junior user's mark would not affect the court's conclusion on the strength of the mark, when the products were not related. The strong distinctiveness of the respective markets renders any confusion unlikely.).

17. **Consumer care in purchase (*Lapp* #3).** The UA HEALTHBOX product retails for $400.[11] Plaintiff points out that this amount is fair for some consumers, but insubstantial to others. As discussed above, the target audience for plaintiff's services

---

[10] As well as "healthbox consulting," "healthbox incubator," "healthbox studio," and "healthbox accelerator."

[11] The free UA RECORD mobile app and the standalone products are not marketed using the disputed mark. (D.I. 25 at ¶¶ 8-11)

differs from that of defendant's product, lowering the likelihood of confusion.

*Checkpoint*, 269 F.3d at 288-89; *see also, Freedom Card,* 432 F.3d at 467 & n.7, 478
(Both parties offered credit card services, but targeted different consumers – defendant
targeted high-income individuals with FICO scores averaging around 780 and plaintiff
targeted low-to-middle income consumers with FICO scores below 580.). Regardless of
affluence, consumers of defendant's products would likely compare the UA
HEALTHBOX product to other similar products before making a purchase. In the same
way, consumers (startups and established companies) of plaintiff's services would
exercise considerable care before applying for or purchasing such services. The court
concludes confusion is unlikely and this factor weighs in defendant's favor.

     18. **Defendant's use of mark (*Lapp* #4) and evidence of actual confusion
(*Lapp* #6).** Although "[e]vidence of actual confusion is not required to prove likelihood
of confusion," such evidence strengthens plaintiff's case. *Checkpoint*, 269 F.3d at 291.
"If a defendant's product has been sold for an appreciable period of time without
evidence of actual confusion, one can infer that continued marketing will not lead to
consumer confusion in the future. The longer the challenged product has been in use,
the stronger this inference will be." *Versa Products Co. v. Bifold Co. (Mfg.)*, 50 F.3d
189, 205 (3d Cir. 1995). Plaintiff presents five emails that it received following
defendant's launch of the UA HEALTHBOX product. In response to an email from
Adhikari attaching an article regarding defendant's launch, Cubii's CEO responded that
he had reached out to Magna for "thoughts." (D.I. 12, ex. 15) Two other emails[12] asked
Adhikari whether defendant had licensed plaintiff's name or entered into a deal with

---

[12] From executives at two of plaintiff's portfolio companies.

plaintiff. (*Id.* at exs. 16, 17) Nashif received an email from the managing director of an investment company with the subject "HBX and UnderArmour" asking "is this healthbox" and attaching a screenshot of the UA HEALTHBOX product. Nashif also received an email from the managing partner of a venture capital fund stating "I hope you received some great licensing revenue ☺[.]" The emails demonstrate that the writers understood that two companies (plaintiff and defendant) were in play and, at most, show that certain individuals inquired whether the companies were working together in some capacity. The emails do not evidence actual consumer confusion in the marketplace.[13] *See, e.g., Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, Civ. No. 12-4112 AJP, 2014 WL 814532, at *19 (S.D.N.Y. Mar. 3, 2014) (The court concluded that the proffered emails showed individuals contacting plaintiff to inquire whether the parties were working on a collaboration, but did not show that the use of the disputed mark "affected a purchasing decision of any kind or confused them as to the source of the products.").

19. Plaintiff also argues that its website received increased traffic after defendant's launch. Specifically, in January 2016, the "web traffic doubled, while organic searches remained flat." (D.I. 30 at 7) Nashif states that "website visitors continued into February 2016 at materially higher year over year rates than typical for [plaintiff]." (D.I. 14 at ¶ 21) Plaintiff submits a copy of "analytics reports for the months of December 2015 through February 2016, which tracks the number of actual visitors to the webpage [and] those visitors executing the JavaScript tracking code when they view

---

[13] In another email cited by plaintiff in its reply brief, Baylor Scott & White Health ("Baylor") discusses both plaintiff's Healthbox foundry service and defendant's UA HEALTHBOX product without confusion. (D.I. 39)

15

a page."[14] (D.I. 36; D.I. 48 at ¶ 4) Plaintiff concludes that this is "compelling evidence [that] consumers incorrectly thought healthbox.com was affiliated with [defendant]." (D.I. 30 at 7) Defendant submits a report from SimilarWeb Ltd.,[15] an analytics company offering website traffic reports, showing an increase in traffic to plaintiff's website in January and February 2016, but declining back to pre-launch level by April 2016. (D.I. 47) Neither party provides adequate explanation of the information presented. Indeed, each party faults the other's reports. The reports (as presented) are not compelling evidence that consumers thought healthbox.com was affiliated with defendant, nor do such reports compel a conclusion of actual consumer confusion.[16] This factor is neutral.

20. **Defendant's intent (*Lapp* #5).** "[C]ourts have recognized that evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding the likelihood of confusion." *Checkpoint*, 269 F.3d at 286. Defendant offers a timeline wherein it conceived, selected, and applied for a trademark about five months before reaching out to plaintiff. Moreover, Magna stated that he had no involvement with the selection of the marks and the requested contact had nothing to do with the UA HEALTHBOX product or marks. Plaintiff's conclusion that the first use of the trademark in January 2016 leads to the inevitable conclusion that

---

[14] Defendant argues that because such report does not include data for March and April 2016, the data is insufficient to draw a meaningful conclusion. (D.I. 47 at ¶¶ 4-5)

[15] Which plaintiff criticizes as inaccurate, because it indicates "not enough data" in several instances. This is defined by Similar Web Ltd. as meaning that "the engagement to this website is too low to allow us to get enough data to provide an accurate estimation of the traffic to this website." (D.I. 48 at ¶¶ 2-3)

[16] The parties' citation to *Granite State Trade Sch., LLC v. The New Hampshire Sch. of Mech. Trades, Inc.*, 120 F. Supp. 3d 56 (D.N.H. 2015), is unhelpful to the analysis at bar. In *Granite*, a marketing consultant testified for plaintiff and explained the traffic pattern on the website in question, which allowed the court to understand and analyze the presented data in order to draw appropriate conclusions. *Id.* at 66.

defendant acted in bad faith, with the intent to swamp the market, is overbroad. There is no evidence of record that defendant intended to benefit from consumer confusion or dominate plaintiff's market. *See ACCU Pers., Inc. v. AccuStaff, Inc.*, 846 F. Supp. 1191, 1211 (D. Del. 1994) ("[A] junior user's prior knowledge of a senior user's trademark use is probative of, but not dispositive of, the question whether the junior user acted in bad faith."); 5 *McCarthy*, § 26:10 ([A] growing body of cases adopt[] the view that the junior user's knowledge is not determinative, but is merely the first step in an enquiry into 'bad faith.'"). This factor is neutral.

21. **Channels of trade and media (*Lapp* #7).** The greater the similarity between the parties' advertising and marketing campaigns, the greater the likelihood of confusion. *Checkpoint*, 269 F.3d at 289; *Kos Pharms.*, 369 F.3d at 722. "This is a 'fact-intensive inquiry' that requires a court to examine the 'media the parties use in marketing their products as well as the manner in which the parties use their sales force to sell their products to consumers.'" *Kos Pharms.*, 369 F.3d at 722 (quoting *Checkpoint*, 269 F.3d at 289). In the case at bar, plaintiff "advertises and markets its business consulting, incubating and venture capital management services through its webpage, www.healthbox.com, press releases and at numerous national speaking engagements." (D.I. 11 at 15) Defendant advertises and sells its product on its "website, the HTC website, and through several national retail distributors of athletic and electronic goods. [It] has marketed the ✦✦ /UA HEALTHBOX product in online advertisements and banner ads on websites relating to the athletic and fitness industries, mass emails to [it's] customers, and postings on [it's] social media pages." (D.I. 24 at 11) That both parties market through the Internet is not determinative.

17

> [I]n the Twenty-First Century, the Internet has become the venue for the advertising and sale of all manner of goods and services. That the goods or services of the parties are both found on the Internet proves little, if anything, about the likelihood that consumers will confuse similar marks used on such goods or services.

4 *McCarthy*, § 24:53.50; *see also Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion."). The parties target different consumers – start-ups and other business for plaintiff and individual consumers for defendant – lessening the overlap in channels such as press releases and online or other marketing campaigns. The court concludes that this factor weighs in favor of defendant.

22. **Intended customers (*Lapp* #8).** When the parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion. *Checkpoint*, 269 F.3d at 289-90. As discussed previously, plaintiff targets businesses, while defendant targets individual consumers. Even taking into account the Baylor email (demonstrating that defendant might sell its product to a business for distribution to individuals within that business), plaintiff offers services used by businesses and defendant offers a product used by individuals. This factor weights in favor of defendant.

23. **Relationship of goods and services (*Lapp* #9).** The test for determining the relationship of goods in the minds of consumers is whether the goods are similar enough that a consumer could assume they were associated with or offered by the same source. *Fisons*, 30 F.3d at 481; *Checkpoint*, 269 F.3d at 286-87. "Near-identity" and "similarity of function" are key to assessing whether consumers may see products

18

as related. *A & H Sportswear*, 237 F.3d at 215. The closer the relationship between the products, the greater the likelihood of confusion. *Kos Pharms.*, 369 F.3d at 722. For the same reasons discussed above (plaintiff offers services to healthcare startups and businesses, whereas defendant offers a fitness product), there is no reason that consumers would be confused concerning the origin of goods and services. This factor weighs in favor of defendant.

24. **Other factors (*Lapp* #10).** In the reverse confusion context, this factor requires "an examination of other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market." *Freedom Card,* 432 F.3d at 481 (citation omitted). Plaintiff argues that "[f]itness and healthcare are concentric circles" and that health and fitness connected device users would expect defendant to offer "[plaintiff]-type products and services." (D.I. 30 at 9) Limiting plaintiff to its services (not the products of its portfolio companies), the court concludes that it is unlikely that the public would expect defendant (a maker and seller of sporting apparel and goods) to expand into healthcare investment or consulting. This factor weighs in favor of defendant.

25. **Weighing of the *Lapp* factors.** Although the marks are somewhat similar, the products and services at issue do not directly compete. *Checkpoint*, 269 F.3d at 282 ([M]ark similarity is not necessarily determinative of likely confusion, particularly when the products do not directly compete.) (citations omitted). Balancing the factors

and considering the totality of the circumstances based on the above analysis of the

*Lapp* factors directs the conclusion that marketplace confusion is unlikely.

26. **Likelihood of success – dilution.** The Delaware Trademark Act ("DTA")

provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties, or the absence of confusion as to the source of goods or services.

6 Del. C. § 3313. In order to prevail on a claim brought pursuant to the DTA, plaintiff

must demonstrate that there is a likelihood of dilution. Likelihood of dilution requires

"some mental association between the marks" and can be defined as a "blurring of a

mark's product identification or the tarnishment of the affirmative associations a mark

has come to convey." *Barnes Group, Inc. v. Connell Ltd. P'ship*, 793 F. Supp. 1277,

1304 (D. Del. 1992) (citation omitted).

27. Plaintiff relies on the emails and website traffic arguments discussed above

and also asserts that the parties' markets are closely related. Defendant's use of its

well-known ⚡⚡ /UA in the disputed mark and a different font renders the marks at

issue different. *See Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 379

(D.N.J. 2002) (finding that the use of a house mark "alone" can defeat a dilution claim)

(citing *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1209-10

(1st Cir. 1983) ("Astra" and "Astra") and *Hormel Foods Corp. v. Jim Henson Prods., Inc.*,

73 F.3d 497, 506 (2d Cir. 1996) (display of "Muppet Treasure Island" next to "Spa'am"

character "alone" could prevent dilution of Hormel's "Spam")). For the reasons

discussed above, the emails provided by plaintiff demonstrate that the sending parties

20

were aware of the two distinct companies and the corresponding marks. The use of the mark on plaintiff's website in association with its services compared to defendant's use on a physical product further weakens plaintiff's argument for blurring of the marks. Defendant has also provided evidence showing that multiple users of the term "healthbox" for health related products exist, with webpages, logos, and marks. It is difficult to reconcile these other uses of the term "healthbox" with the plaintiff's argument that only defendant's use of the term dilutes plaintiff's mark. Accordingly, the court concludes that defendant's use of  ✦✦  /UA HEALTHBOX does not dilute plaintiff's use of Healthbox®.

28. **Likelihood of success on the merits – conclusion.** For the reasons articulated above, plaintiff has not carried its burden to prove likelihood of success on the merits of its trademark infringement claim, unfair competition claim, or dilution claim.

29. **Irreparable harm.** Nashif asserts that the harm to plaintiff's business cannot be adequately redressed by damages as defendant's actions are jeopardizing plaintiff's business reputation and the continuing value of its brand and mark. Plaintiff requests that the court issue an injunction and order defendant to recall its sold products.[17]  (D.I. 11 at 20; D.I. 14 at ¶ 28)  Defendant's products have been on the market since January 2016. According to defendant, it would incur over $12 million in losses, expenses, and

---

[17] The court does not address at length plaintiff's request for a recall of all of defendant's wearable connected fitness devices distributed with the disputed mark. Such a recall requires plaintiff to demonstrate: (1) the willful or intentional infringement by defendant; (2) whether the risk of confusion to the public and injury to the trademark owner is greater than the burden of the recall to defendant; and (3) a substantial risk of danger to the public due to defendant's infringing activity. *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 233 (3d Cir. 2003) (citations omitted). Plaintiff has not done so.

fees if forced to recall and rebrand the ⚡⚡ /UA HEALTHBOX product.[18] (D.I. 25 at ¶¶ 19-22; D.I. 27 at ¶¶ 21, 25, 26, 43, 49) Plaintiff has not offered evidence of damages such as a decline in companies participating in its financial incubation services or partnering with it for advising services. The court concludes that this factor weighs in favor of defendant.

30. **Reputation and goodwill.** Plaintiff argues that defendant creates "a likelihood of confusion as to the source, sponsorship, or affiliation with plaintiff." According to plaintiff, defendant's "actions not only dilute the Healthbox® mark, they put plaintiff's reputation at risk in the event of quality or safety issues with [defendant's] wearable products and connected fitness systems." (D.I. 11 at 19) On the other hand, defendant alleges that a recall and rebranding would result in damage to its reputation and goodwill with its consumers, investors, manufacturing partners, retail partners, sponsored athletes, as well as its media and business contacts. (D.I. 25 at ¶¶ 23-31; D.I. 27 at ¶¶ 27-41) Moreover, such an injunction would harm defendant's ability to relaunch the ⚡⚡ /UA HEALTHBOX product name if it prevailed at trial. (D.I. 25 at ¶ 20) The court concluded above that there was not a likelihood of confusion. Plaintiff does not manufacture and sell wearable products and connected fitness systems, rendering its argument regarding quality and safety tenuous at best. Defendant's damages would flow naturally from a recall. This factor weighs in favor of defendant.

---

[18] Plaintiff criticizes defendant's calculations of damages, asserting that each declarant relied on inadmissible evidence prepared for litigation and that the declarants were "told" financial numbers. (D.I. 30 at 12-13) At this juncture, defendant has quantified its damages, sufficient to show the logical effect of a recall and rebranding, i.e., the loss of sales and added costs.

31. **Irreparable harm – conclusion.** Based on the above analysis, the factors presented to the court weigh in favor of defendant. Plaintiff has not demonstrated irreparable harm.

32. **Balance of hardships.** Plaintiff alleges it will lose the reputation it spent years building and the value of its brand will be destroyed. Defendant has presented concrete evidence that a recall and rebrand would cost it millions of dollars and alleges damages to its reputation and goodwill. This factor is at best neutral, if not weighing in favor of defendant.

33. **Public interest.** This factor is largely neutral. The public has an interest in not being deceived or confused. The parties operate in separate market areas and target different customers. On the record at bar, no confusion has been evidenced. Indeed, plaintiff's customers are businesses, with sophisticated decision-makers.

34. **Conclusion.** For the foregoing reasons, plaintiff's motion for preliminary injunction (D.I. 10) is denied.

United States District Judge